429 F.2d 820
 Bobby BRUNSON, Elizabeth Brunson and Ellis Brunson, by
McQueen Brunson, their father and next friend, et
al., Appellees,
v.
BOARD OF TRUSTEES OF SCHOOL DISTRICT NO. 1 OF CLARENDON
COUNTY, SOUTH CAROLINA, L. B. McCord, County Superintendent
of Education; C. E. Buttes, District Superintendent of
Education; J. W. Sconyers, Chairman Board of Trustees; C. N.
Plowden, W. A. Brunson, Henry Everett, and L. Richardson,
Members of the Board of Trustees, Appellants, United States
of America, Amicus Curiae.
 No. 14571.
 United States Court of Appeals, Fourth Circuit.
 Argued June 5, 1970.
Decided June 5, 1970.
 
 David W. Robinson, Columbia, S.C., for appellants.
 Vilma Martinez Singer, New York City, (Matthew J. Perry, Lincoln C. Jenkins, Jr., Columbia, S.C., Mordecia Johnson, Florence, S.C., Jack Greenberg, Norman Chachkin and Michael Davidson, New York City, on brief) for appellees.
 Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN, WINTER, CRAVEN and BUTZNER, Circuit Judges.
 
 
 1
 By authority of a majority of the Court, it is ordered:
 
 
 2
 1. That the judgment of the District Court be, and it hereby is, affirmed.
 
 
 3
 2. That the right is reserved by each of the Judges to file an opinion expressing his individual views.
 
 
 4
 By direction of a majority of the Court.
 
 
 5
 CRAVEN, Circuit Judge, with whom HAYNSWORTH, Chief Judge, and BRYAN, Circuit Judge, join, concurring and dissenting:
 
 
 6
 I agree with the district court that the school board's freedom of choice plan was inadequate and ineffective, as judged by the standard of Green v. New Kent County Board of Education, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), to dismantle its dual school system and establish a unitary one. I do not agree, however, with the district court's approval of the desegregation plan proposed by the Department of Health, Education and Welfare.
 
 
 7
 As of September 1969, there were 2408 black students and 256 white students enrolled in the system. Summerton Elementary School remained a virtually all-white school with 145 white students and 12 Negro students in attendance. Summerton High School was racially 'desegregated' in a similar fashion with 111 white students and 16 Negro students. The other four schools in the system were 100 percent black. The school board's freedom of choice plan has, therefore, resulted in token desegregation only.
 
 
 8
 Just as the school board plan has achieved too little, so also the HEW plan, approved by the district court and affirmed on appeal, attempts too much. If all of the 256 white students currently in the system remain there, and that seems doubtful as will be explained below, the result under the approved plan will be a heavy majority of black studens in each school with the percentage of white students in each school ranging from 5 percent to 17 percent. This may be 'desegregation,' but it is not, in my opinion, 'integration.'[1]
 
 
 9
 It is true that constitutional principles may not be allowed to yield to community opposition. Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); Walker v. County School Board of Brunswick County, 413 F.2d 53 (4th Cir. 1969). It is equally true, however, that judges in fashioning remedies cannot successfully ignore reality. I do not suggest that the constitutional right of the black students in Clarendon District No. 1 to attend a non-racial school system may be disregarded. Quite the contrary, I would attempt to implement that right as nearly as is physically possible by creating a system with two 'integrated' schools rather than a system with only 'black' schools.[2] The extreme remedy proposed by HEW and approved by this court threatens to swallow up, rather than vindicate, the constitutional mandate for integrated schools in Clarendon District No. 1. There is reason, even beyond the ten to one ratio of black to white students in the district, to doubt that the HEW plan can ever be effective. In 1969, 110 white students fled the public school system in favor of a parochial private school in Summerton, leaving only 256 white students in the public schools. Counsel now advises in oral argument that approximately 100 more white students have made application to the parochial school for admission in September 1970. If this is a correct prognosis, it suggests to me that some degree of moderation in selecting a remedy is more likely to accomplish the desired result, a unitary, non-racial public school system, than is unyielding fidelity to the arithmetic of race. It will be ironic, and contrary to the spirit of Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), if the result of application of the Brown constitutional principle in this case is simply to accomplish an all-black school system.
 
 
 10
 The threat of flight from the public school system ordinarily should not be allowed to influence the selection of the plan or its judicial approval. It is relevant here only because the whites constitute such a small minority. The crucial consideration, however, is that the approved plan will serve the constitutional purpose poorly even if the handful of whites remain to attend each of the schools, for they are so few that a distribution of them cannot succeed in altering the essentially black character of each school.
 
 
 11
 I would remand to the district court with instructions to require the school board to submit a pupil assignment plan attaining in one high school and in one elementary school an undiscriminating racial mix[3] to the extent feasible. Such a practical approach to the problem would, I believe, greatly diminish the temptation to flee the system. Judging from experiences in other school systems, the parents of most white students would probably accept integration in the form of an educationally optimum racial mix and adjust to it rather than bear the financial burden of removing their children to a private school.
 
 
 12
 The principle that no child should be excluded from any school because of his race calls for some recognition of a right of choice here. No black child who wishes to attend one of the 'white' schools should be excluded. If it appears that their number would be insufficient to produce integration, then other black children may be assigned involuntarily to those schools to bring the ratio up to an acceptable level. If a larger number of the black children wished to attend one of the 'white' schools, however, I do not think any one of them could be excluded.
 
 
 13
 With that caveat, I believe that a remand with such directions would serve the basic constitutional principle much more faithfully than a random scattering of so small a minority of whites among all the schools, which thereafter will be all-black schools for all practical purposes whether or not the whites remain in the system.
 
 
 14
 From Dred Scott through Brown II and beyond3A I read the social and constitutional history of the nation and its Negro citizens as does Judge Sobeloff in his special concurrence. I think we grasp it the same way and even with the same hope for the future.
 
 
 15
 Perhaps my hope is too idealistic: that there can be achieved, even in Clarendon County, some degree of mutual respect, trust, confidence, even friendship, between black and white children. It won't occur without their knowing each other, and concededly there will be little contact under the HEW plan.
 
 
 16
 The living insult to black people inherent in segregation as one aspect of prejudice will be eradicated when black and white people come to know and understand each other as one people in one nation. In that endeavor I am unwilling to write off even one county in one state. I would keep the Brown principle and apply it to the maximum extent practicable in Clarendon County.
 
 
 17
 Separate concurring opinion of SOBELOFF, Circuit Judge:
 
 
 18
 This case is the lineal descendant of Briggs v. Elliot, one of the four cases consolidated in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).[1] That it is still being litigated at this date, nineteen years since Briggs was initiated and sixteen years after the decision in Brown, is a most sobering thought.
 
 
 19
 The sole prayer of the Board's appeal was that it be allowed to retain a freedom of choice plan that never has worked and never will. For many years the fountainhead of freedom of choice was Judge Parker's famous dictum on the remand of Briggs itself.[2] But the era of freedom of choice as a barrier to integration is over, Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and the Briggs pronouncement is dead. Walker v. County School Board of Brunswick County, 413 F.2d 53, 54 n. 2 (4th Cir. 1969). As its appeal shows, the Clarendon County Board, so closely associated with the doctrine from its genesis, is as yet unprepared to recognized its demise.
 
 
 20
 This appeal was the first to be reached for hearing after our decision in Swann v. Charlotte-Mecklenburg Board of Education, 431 F.2d 138 (4th Cir. 1970). At oral argument counsel urged that to jettison freedom of choice and force white children to attend schools in which they would be a minority would be 'unreasonable' under the standard newly announced in Swann. I ventured in Swann that 'handed a new litigable issue-- the so-called reasonableness of a proposed plan-- school boards can be expected to exploit it to the hilt,' 431 F.2d at 154. Thus the prediction has already been realized.
 
 
 21
 Nevertheless, it is not so much what the Board has said but what my dissenting colleagues say that prompts this response. The dissenters agree that the Board's freedom of choice plan is deficient, but they consider the remedy too strong. As they point out, we are threatened in this case with an exodus of white students that tends to convert the court-ordered integration into an exercise in futility. Understandably my Brethren grope for a practical solution; but this desire has caused them to seize on an idea which, I am convinced, they would on deeper consideration reject. What appears to them in this case as a moderate expedient is, in my opinion, legally unfounded and fraught with injurious consequences.
 
 I.
 
 22
 The linch-pin of the dissent is the notion that, ideally, the goal of desegregation should be to achieve an 'optimal mix,' consisting of a white majority. It suggests, as did Dr. Pettigrew in his testimony in Brewer v. School Board of City of Norfolk (4th Cir. 1970), that desegregation should not go so far as to put whites in minority situations. In Brewer we gave short shrift to the Board 'principles' fashioned largely from Dr. Pettigrew's testimony. Summary treatment is all it deserved.
 
 
 23
 Essentially, the theory postulates that the quality of a school depends largely on its 'class climate,' and that middle class schools are better. Therefore it is important to create dominantly middle class school populations. The optimum level, which would include enough middle class students to establish the class character of the school and at the same time include a substantial number of lower class children to benefit from it, would be about 70% Middle class and 30% Lower class. In general, the theory continues, 'white' is synonymous with 'middle class,' 'black' is the same as 'lower class.' Accordingly, the educationally sound objective is to achieve majority white schools (optimally 70-30).
 
 
 24
 Since the dissent has seen fit in this case to revive the spectre of the Pettigrew thesis, previously cast aside, I cannot let the matter pass without comment. This is no mere issue of expert testimony. It is no mere question of 'sociology and educational theory.' There have always been those who believed that segregation of the races in the schools was sound educational policy, but since Brown their reasoning has not been permitted to withstand the constitutional command. When the underpinnings of the white majority proposal are exposed, they seem to constitute a direct attack on the roots of the Brown decision. The minority's readiness even to entertain the idea reflects, I respectfully submit, a profound misunderstanding of the social and constitutional history of this nation and the Negro people.
 
 
 25
 It would, I am sure, astonish the Brown court to learn that 16 years later, in a case stemming directly from that decision, it was seriously being contended that desegregation might not be required insofar as it threatened to impair majority white situations. My conviction comes not only from a reading of the Brown opinion itself but from a conspectus of over 100 years of constitutional adjudication.
 
 
 26
 To begin to assess the magnitude of the Brown declaration, one must understand the significance of Dred Scott v. Sanford, 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1856), which is at once the low mark and the focal point of the constitutional history of the rights of black Americans. For there, in one gratuitous, sweeping opinion, Chief Justice Taney offered a justification for the slave system and all its incidents. Black people had been given no rights under the Constitution because they were not included as part of the 'people of the United States.' They were excluded because, in the opinion of the founding fathers, they were
 
 
 27
 'Beings of an inferior order, and altogether unfit to associate with the white race, either in social or political relations; and so far inferior, that they had no rights which the white man was bound to respect; and that the Negro might justly and lawfully be reduced to slavery for his benefit.' 60 U.S. at 407.
 
 
 28
 The inferiority of the black man was thus the 'axiom in morals as well as politics' (Id.) that furnished the justification not only for slavery, but also of the 'perpetual and impassable barrier * * * intended to be erected between the white race and the one which they had reduced to slavery' (Id. at 409) in the free as well as slave states. To preserve the separation it had thus been necessary 'to stigmatize, and (impress) deep and enduring marks of inferiority and degradation' (Id. at 416) upon the Negro race.
 
 
 29
 The Thirteenth, Fourteenth and Fifteenth Amendments were the explicit and total repudiation of the Dred Scott teaching. Their adoption signaled a national revulsion against the premises of Dred Scott, a national commitment to eliminate the degradation imposed upon the black man and a national determination to elevate him to equal status. Yet the post-Reconstruction Supreme Court failed to acknowledge the far-reaching ramifications of the Wartime Amendments. It found in the Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883), no affirmative federal power to end discrimination in public accommodations, and in Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), no violation of the Constitution in state-enforced 'separate but equal' facilities. The Plessy majority thought
 
 
 30
 the underlying fallacy of the plaintiff's argument to consist in the assumption that the enforced separation of the two races stamps the colored race with a badge of inferiority. If this be so, it is not by reason of anything found in the act, but solely because the colored race chooses to put that construction upon it. 163 U.S. at 551, 16 S.Ct. at 1143.
 
 
 31
 With this facile assertion the Court passed over the obvious truth that 'the Black Codes were a substitute for slavery; segregation was substituted for the Black Codes.' Bell v. Maryland, 378 U.S. 226, 247, 84 S.Ct. 1814, 1826, 12 L.Ed.2d 822 (1964) (opinion of Douglas, J.) But even more astounding the Court ignored (without even a citation) the explicit justification given to apartheid in Dred Scott and saw fit instead to ascribe the degraded status of the Negro race to its voluntary self-abasement.
 
 
 32
 This sophism was well perceived by the first Mr. Justice Harlan, who predicted that Plessy would be 'quite as pernicious as the decision made by the tribunal in the Dred Scott Case.' 163 U.S. at 559, 16 S.Ct. at 1147. It was the majority's refusal fully to negate the Dred Scott axiom that prompted Harlan's famous dissent:
 
 
 33
 In view of the Constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our Constitution is color blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. Id.
 
 
 34
 The significance of Brown must be appraised against this background. Certainly Brown had to do with the equalization of educational opportunity; but it stands for much more. Brown articulated the truth that Plessy chose to disregard: that relegation of blacks to separate facilities represents a declaration by the state that they are inferior and not to be associated with. By condemning the practice as 'inherently unequal,' the Court, at long last, expunged the constitutional principle of black inferiority and white supremacy introduced by Dred Scott, and ordered the dismantling of the 'impassible barrier' upheld by that case. As Judge Wisdom said in rejecting the dictum of Briggs v. Elliot, Brown's broad meaning, its important meaning, is its revitalization of the national constitutional right the Thirteenth, Fourteenth, and Fifteenth Amendments created in favor of Negroes. This is the right of Negroes to national citizenship, their right as a class to share the privileges and immunities only white citizens had enjoyed as a class. Brown erased Dred Scott, used the Fourteenth Amendment to breathe life into the Thirteenth and wrote the Declaration of Independence into the Constitution. Freedmen are free men. They are created as equal as are all other American citizens and with the same inalienable rights to life, liberty, and the pursuit of happiness. No longer 'beings of an inferior race'-- the Dred Scott article of faith-- Negroes too are part of 'the people of the United States.'
 
 
 35
 United States v. Jefferson County Board of Education, 372 F.2d 836 (5th Cir. 1966), aff'd en banc, 380 F.2d 385 (5th Cir. 1967), cert. denied, Caddo v. Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967).
 
 
 36
 The invidious nature of the Pettigrew thesis, advanced by the dissent in the present case, thus emerges. Its central proposition is that the value of a school depends on the characteristics of a majority of its students and superiority is related to whiteness, inferiority to blackness. Although the theory is couched in terms of 'socio-economic class' and the necessity for the creation of a 'middle-class milieu,' nevertheless, at bottom, it rests on the generalization that, educationally speaking, white pupils are somehow better or more desirable than black pupils. This premise leads to the next proposition, that association with white pupils helps the blacks and so long as whites predominate does not harm the white children. But once the number of whites approaches minority, then association with the inferior black children hurts the whites and, because there are not enough of the superior whites to go around, does not appreciably help the blacks.
 
 
 37
 This idea, then, is no more than a resurrection of the axiom of black inferiority as justification for separation of the races, and no less than a return to the spirit of Dred Scott. The inventors and proponents of this theory grossly misapprehend the philosophical basis for desegregation. It is not founded upon the concept that white children are a precious resource which should be fairly apportioned. It is not, as Pettigrew suggests, because black children will be improved by association with their betters. Certainly it is hoped that under integration members of each race will benefit from unfettered contact with their peers. But school segregation is forbidden simply because its perpetuation is a living insult to the black children and immeasurably taints the education they receive. This is the precise lesson of Brown. Were a court to adopt the Pettigrew rationale it would do explicitly what compulsory segregation laws did implicitly.
 
 
 38
 Moreover, even apart from its racial aspect, the Pettigrew plan would be constitutionally illegitimate. To recall the words of Mr. Justice Harlan, 'there is no caste here.' The goal of social class segregation is scarcely more defensible than that of racial segregation. The notion that public authorities may use their powers and resources to erect a system of social stratification is not only novel but totally alien to the democratic idea. Viewing the matter on a policy level, a country as sadly riven as ours stands in no need of additional polarizing projects. From a constitutional standpoint, a program of apartheid according to social class is as impermissible as avowed racial separation-- and as repugnant to the Equal Protection Clause. Our Constitution does not permit the insulation of whites from blacks, rich from poor, high class from low class.
 
 II.
 
 39
 The dissent's exposition of the white majority thesis is only in connection with its perception of a serious 'white flight' problem. The position of the dissenting Judges is somewhat ambiguous because each of them in Brewer joined in disapproving the Board's plan based on Pettigrew.[3] Essentially the dissenting opinion, as I read it, does not advocate that white majorities are to be protected generally. However, my Brethren do argue that the predominantly white status should be preserved when not to do so would put the whites in such small minorities that they would predictably flee the public school system.
 
 
 40
 'White flight' is one expression of resistance to integration, but the Supreme Court has held over and over that courts must not permit community hostility to intrude on the application of constitutional principles. Brown II, 349 U.S. at 300, 75 S.Ct. 753, 99 L.Ed. 1083; Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). The Court has specifically addressed itself to this problem:
 
 
 41
 We are frankly told in the Brief that without the transfer option it is apprehended that white students will flee the school system altogether. 'But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them.' Brown II, 349 U.S. at 300, 75 S.Ct. at 756.
 
 
 42
 Monroe v. Board of Com'rs of City of Jackson, 391 U.S. 450, 459, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968). The force of the holding is inescapable: dissidents who threaten to leave the system may not be enticed to stay by the promise of an unconstitutional though palatable plan.
 
 
 43
 I too am dismayed that the remaining white pupils in the Clarendon County schools may well now leave. But the road to integration is served neither by covert capitulation nor by overt compromise, such as adoption of a schedule of 'optimal mixing.'
 
 
 44
 If the sweep of the dissenters' argument extended no further than to seek a detente in this one school district it would still be erroneous, but I would not feel compelled to voice this special expression. However, the influence of judicial sanction-- in any situation-- of the white majority model cannot be so confined. The purported restriction of the thesis to extreme white minority-white flight situations is really no limitation at all. Rather it offers a premium for community resistance. More to be feared than white flight in Clarendon County would be any judicial countenancing of the suggestion that abandoning or qualifying a desegregation program is a legally acceptable way to discourage flight. For once this tactic were sanctioned in this instance its insidious example would be followed by other school boards hostile to desegregation, with resulting widespread frustration of the unitary school principle.
 
 
 45
 Circuit Judge WINTER authorizes me to state that he joins in this opinion.
 
 
 
 [1]
 The federal courts, when plunged into sociology and educational theory, are into something they know very little about. Dr. Thomas F. Pettigrew of Harvard University, who has a respectable socialpsychology pedigree and who is a recognized expert in school integration, testified at great length about integration and desegregation in Brewer v. Norfolk City School Board (4th Cir. 1970). In the course of that testimony he distinguished 'desegregation' from 'integration':
 Desegregation is the mere mix of bodies, black and white, in the same school * * *. And the word 'integration' * * * presupposes desegregation * * * you couldn't have it without the mix * * * but it is a statement about the quality of the mix, the kind of interaction of the children of the two races, and here I would want to put special emphasis on cross-racial acceptance. If you ask black children * * * of what race are your closest friends? It turns out in an integrated school that they say some-- not all-- of their closest friends are white. You ask the white children in the same school, and they say some-- not all-- of their closest friends are black.
 Dr. Pettigrew further testified that 'there does seem to be some optimum level for the achievement of both white and black children that drops after 35 or 40 (percent black students in the school is surpassed.)' Dr. Pettigrew has concluded that little advantage is gained for children of either race, and some harm may result, from placing children in a school where they are in a distinct racial minority. He expresses the viewpoint that courts have been too concerned with a body count by race and too little concerned with the advantages that may accrue in the optimum situation. 'To speak of a balanced system in Washington, D.C.,' he testified, 'where each school would reflect the ratio of 92 (black) to 8 (white), that is not what I mean by a real opportunity to generate integrated education.' Dr. Pettigrew advocates the establishment of an optimum 30 percent black to 70 percent white ratio in as many schools as possible through the use of educational parks and through disregard of traditional school district lines.
 
 
 [2]
 In Swann v. Charlotte-Mecklenburg Board of Education, 431 F.2d 138 (4th Cir. May 26, 1970), Judge Butzner, speaking for three members of this court, said: 'While a 60%-40% Ratio of white to black pupils might be desirable under some circumstances, rigid adherence to this formula in every school should not be allowed to defeat integration.' In my view, this is not a case where 'integration' could be defeated by application of the optimum ratio, but a case where maximum 'integration' can be achieved only by its application
 
 
 [3]
 See note 1, supra
 3A Nothing I have said is intended to resurrect the Briggs dictum. Indeed, I confess authorship of the per curiam opinion in Walker v. Brunswick County School Board, 413 F.2d 53, 54 n. 2 (4th Cir. 1969), that noted its death.
 
 
 [1]
 In 1951 plaintiffs instituted suit against Clarendon County to declare unconstitutional the laws of South Carolina requiring segregation of the races. A three-judge court was convened and relief was denied. Briggs v. Elliot, 98 F.Supp. 529 (D.S.C.1951), vacated, 342 U.S. 350, 72 S.Ct. 327, 96 L.Ed. 392 (1952), on remand, 103 F.Supp. 920 (D.S.C.1952). The Supreme Court reversed in Brown I, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and remanded in Brown II, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), to the District Court, 132 F.Supp. 776 (D.S.C.1955)
 The Briggs suit was terminated in 1960 and a new suit was commenced before a single district judge. After a further period of protracted litigation the case has reached its present stage. Brunson v. Board of Trustees of School Dist. No. 1 of Clarendon County, 30 F.R.D. 369 (D.S.C.), rev'd, 311 F.2d 107 (4th Cir. 1962), cert. denied, 373 U.S. 933, 83 S.Ct. 1538, 10 L.Ed.2d 690 (1963), on remand, 244 F.Supp. 859 (D.S.C.1965); 271 F.Supp. 526 (D.S.C.1967).
 
 
 [2]
 'Nothing in the Constitution or in the decision of the Supreme Court takes away from the people freedom to choose the schools they attend. The Constitution, in other words, does not require integration-- it merely forbids discrimination.' 132 F.Supp. 776, 777 (E.D.S.C.1955)
 Judge Parker's aphorism has been the subject of extended discussion by Judge Wisdom in United States v. Jefferson County Board of Educ., 372 F.2d 836, 862 (5th Cir. 1966), aff'd en banc, 380 F.2d 385 (5th Cir. 1967), cert. denied, Caddo Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967), and by myself in a separate opinion in Bowman v. County School Board of Charles City County, 382 F.2d 326, 336 (4th Cir. 1967), and Green v. County School Bd. of New Kent County, 382 F.2d 338 (4th Cir. 1967), rev'd, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).
 
 
 [3]
 The court held that
 Application of the board's principles of assignment for elementary and junior high schools fails to create a unitary school system in Norfolk. Instead it effectively excludes many black pupils from integrated schools on account of their race, a result which is the antithesis of a racially unitary system.
 Judge Bryan concurred specially and said that
 Utilization of these concepts, even if assumed to be sound scholastically, and although adopted bona fide by the Board and the Court as innovations to better the offering of public education, cannot stand against the peremptory decrees of Brown and its procreations. No fault can be found in the majority's reiteration and exposition of the law to this effect, both as to pupils and faculty.